[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of marriage and other relief brought to the Judicial District of Danbury. Many of the facts that give rise to this action are not in dispute. The plaintiff, whose maiden name is Cynthia A. Fesh, and the defendant, were married on September 11, 1982 at Brookfield, Connecticut. The plaintiff has resided continuously in the State of Connecticut for at least one year immediately prior to the date of the complaint. The marriage between the parties has broken down irretrievably without any reasonable prospects of reconciliation. There are two minor children issue of the marriage: Curtiss O. Bryant, Jr. (also known as C.J.), born February 2, 1983; and Clifton A. Bryant, born March 21, 1984. No other minor children have been born to the plaintiff wife since the date of marriage of the parties. The parties have received state assistance.
I. PROBATE COURT INVOLVEMENT
The plaintiff and the defendant were referred to the Department of Children and Families in January, 1989. A protective services referral was received from the Brookfield school system based on the school nurse's observation of the minor child Curtiss having numerous bruises. The nurse attempted to contact the family and found the defendant to be incoherent over the telephone. An investigation by the Department of Children and Family revealed a very poor physical home condition at the time. On February 27, 1989, the plaintiff was arrested for possession of cocaine. The defendant, in an intoxicated CT Page 2459 condition, went to the home of his sister, Charlotte Graham, with the two minor boys. An investigation by the Department of Children and Family disclosed a long term drug and alcohol problem for the defendant and a drug problem for the plaintiff. This had led to neglect of both children. The Brookfield Probate Court awarded temporary custody of the minor child Curtiss to his paternal aunt, Charlotte Graham, on March 7, 1989. Both parents consented to this award. On January 23, 1990, the Brookfield Probate Court removed the plaintiff and the defendant as guardians of the persons of the two minor children and appointed the paternal aunt, Charlotte E. Graham, as guardian. Both parents consented to this appointment. By decree, dated June 25, 1991, guardianship of Curtiss was transferred to the intervening grandmother, Marjorie Bryant, by the Brookfield Probate Court. On August 2, 1991, the intervening grandmother applied to be appointed as guardian of Clifton. On August 11, 1991, Joan Ferris, the maternal grandmother, applied to be guardian of Clifton. Those applications are still pending in the Brookfield Probate Court. The paternal aunt, Charlotte Graham, does not seek to have custody of the minor child Clifton, although she is still his guardian.
A threshold issue before the court is whether this court has jurisdiction to enter a custody decree involving the two minor children when the intervening paternal grandmother, Marjorie Bryant, presently is the guardian of the minor child Curtiss; and the paternal aunt, Charlotte Graham, presently is the guardian of the minor child Clifton. An analogous issue arose in the case of In re Juvenile Appeal, 195 Conn. 344 (1985). In discussing the relationship between § 46b-129 (a) on the one hand and §§ 45-43a, 45-44c, 45-45 and 45b-121. The court held in part at pages 365-366 as follows:
 We recognize that the Probate Court holds jurisdiction over certain guardianship matters involving children. See, e.g., General Statutes §§ 45-43a, 45-44c, 45-45; see also General Statutes § 46b-121. We also recognize that the ultimate effect of a custody-guardianship vested by the Superior court in a `suitable and worthy' third party pursuant to § 46b-129 (d) may be identical to that rendered by an appointment of guardianship made by the Probate Court. [W]hen two statutes relate to the same subject matter every effort should be made to find a reasonable field for the operation of both statutes. . . . [W]here there is a reasonable field of operation for each CT Page 2460 statute which does not impinge on the domain of the other, it is the court's duty to give them concurrent effect.'
 The language of § 46b-129, particularly that of subsection (d), reveals that the General Assembly contemplated a clear distinction between guardianships ordered by the Superior Court in accordance with that provision and those ordered by appointment of the Probate Court. Accordingly, we construe § 46b-129 (d) as conferring exclusive jurisdiction on the Superior Court to enter `custody-guardianship orders' in those cases in which there is a `finding and adjudging' by that court that the `child or youth is uncared-for, neglected or dependent,' and this finding, moreover, must be the product of a neglect petition filed with the Superior Court pursuant to § 46b-129. This construction still allows effect to be given those provisions of our statutes that authorize the Probate Court in cases not brought under § 46b-129 to remove a parent as guardian and then to appoint a guardian of a minor under such statutes as General Statutes §§ 45-43a, 45-44, 45-44c, 45-45.
(Citations omitted; internal quotation marks omitted.)
This court holds that under the rationale of In re JuvenileAppeal, that the Superior Court has exclusive jurisdiction to enter custody and visitation orders in those cases where custody is sought incident to dissolution of marriage as provided for in § 46b-1(4). This construction still allows effect to be given those provisions of our statutes that authorize the Probate Court in cases not brought under § 46b-1 and § 46b-40, to remove a parent as guardian and appoint a guardian of the minor. All of the remaining aspects of the guardianship decree from the Probate Court will remain in effect except as it relates to custody. If the question of custody of an infant is presented in divorce proceedings, or by a writ of habeas corpus, the Superior Court is the proper forum. Pfeiffer v. Pfeiffer, 97 Conn. 154,157 (1923). A Superior Court decree as part of a dissolution action awarding custody of a child does not remove an existing guardianship order. The Probate Court order is concerned with guardianship while the Superior Court is concerned with custody and visitation. Dinino v. Dinino, 11 Conn. Sup. 246, 250-251
(1942).
11. THE ISSUE OF JURISDICTION
The primary issue involved in this trial has to do with the CT Page 2461 custody and visitation of the two minor children. The dispute is primarily between the plaintiff mother and the intervening paternal grandparents. The Superior Court has jurisdiction to make a custody and visitation order if it has jurisdiction under the provisions of Chapter 815o. Section 46b-93 in Chapter 815o Jurisdiction, provides as follows:
 Sec. 46b-93. jurisdiction. (a) The superior court shall have jurisdiction to make a child custody determination by initial or modification decree if: (1) This state (A) is the home state of the child at the time of commencement of the proceeding, or (B) had been the child's home state within six months before the commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state; or (2) it is in the best interest of the child that a court of this state assume jurisdiction because (A) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (B) there is available in this state substantial evidence concerning the child's present or future care, protection, training and personal relationships; or (3) the child is physically present in this state and (A) the child has been abandoned or (B) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or (4)(A) it appears that no other state would have jurisdiction under prerequisites substantially in accordance with subdivisions (2) or (3) of this subsection, or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (B) it is in the best interest of the child that this court assume jurisdiction.
 (b) Except under subdivisions (3) and (4) of subsection (a) of this section, physical presence in this state of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination.
 (c) Physical presence of the child is not a prerequisite for jurisdiction to determine his custody.
Section 46b-93 (a)(1) differs from § 46b-93 (a)(2)(3)(4) in that § (1) is limited to the facts that existed "at the time of commencement of the proceeding." Thus, in determining the applicability of § 46b-93 (a)(1), the court is limited to the CT Page 2462 facts that existed at the time of the commencement of the proceeding. However, in determining jurisdiction under the provisions of § 46b-93 (a)(2)(3)(4), the court may consider all facts that exist as of the date of trial. The purposes of the UCCJA are found in § 46b-91. As stated in Kioukis v. Kioukis,185 Conn. 249, 253, (1983):
 The basic scheme of the Act is simple. First, one court in the country assumes full responsibility for the custody of a particular child. Second, for this purpose a court is selected which has access to as much relevant information about the child and family in the state as possible. Third, other essential evidence, which is inevitably out-of-state in the case of an interstate child, is channelled into the first court which might be called the `custody court.'
In discussing the provisions of § 46b-93 (a), the Kioukis
court stated, in part, at page 258, as follows:
 On remand, if the trial court determines that it has jurisdiction under any provision of § 46b-93, it must then consider the effect of § 46b-97. Section 46b-97 declares, in part: `(a) A court which has jurisdiction under this chapter to make an initial or modification decree may decline to exercise its jurisdiction any time before making a decree if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum.' [Emphasis provided.]
Even if the court finds jurisdiction under § 46b-93, it must also consider whether it should decline jurisdiction under § 46b-97. In discussing § 46b 97, the court in Brown v.Brown, 195 Conn. 98, 107-109 (1985) stated, in part, as follows:
 We note that the question here is not whether jurisdiction existed in Connecticut, but rather whether it should be declined pursuant to § 46b-97. These questions are separate and distinct under the UCCJA which envisages that where concurrent jurisdiction exists, only one state should exercise that jurisdiction. [Citations omitted.]
 Section 7 of the UCCJA, adopted by the Connecticut General Assembly and codified at General Statutes § 46b-97, . . . permits the courts of our state to decline jurisdiction over custody disputes in accordance with that section. Moreover, in adopting § 1 of the act; General Statutes § 46b-91; the legislature has expressed the intent that CT Page 2463 it is the policy in Connecticut to `assure that litigation concerning the custody of a child take place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training and personal relationships is most readily available, and that courts of this state decline the exercise of jurisdiction when the child and his family have a closer connection with another state . . . .' General Statutes § 46b-91 (a)(3).
 By its express language, § 46b-97 (c) directs the Connecticut courts, in considering whether to decline to exercise their proper jurisdiction, to `take into account the following factors, including but not limited to' those enumerated therein; see footnote 3, supra; and thus contemplates that considerations that evolved under the traditional common law doctrine of forum non conveniens . . . . are not supplanted by the `inconvenient forum' provision of the UCCJA. . . . The common law principle of forum non conveniens provides that a court `may resist imposition upon its jurisdiction' even when it has jurisdiction. (Emphasis added.) [Citation omitted.]
 Moreover the factors expressed in § 46b-97(c) are to be considered in view of the overall goal of determining `if it is in the interest of the child[ren] that another state assume jurisdiction'
(Emphasis added.) General Statutes § 46b-97 (c); see Agnello v. Becker, 184 Conn. 421, 429, 440 A.2d 172 (1981). The purpose of the inconvenient forum provision thus `is to encourage judicial restraint in exercising jurisdiction whenever another state appears to be in a better position to determine custody of a child.' UCCJA § 7, Commissioners' note. As we have noted in conjunction with the forum non conveniens doctrine, the § 46b-97(c) factors are not preclusive. In passing, we also note that the `home state factor' relied upon by the plaintiff `was never intended to tip the balance of factors toward a new forum.' [Emphasis provided; citation omitted.]
 Declining jurisdiction under § 46b-97 is discretionary with the court. By the inclusion of the word `may' in that section the legislature clearly intended that the inconvenient forum issue in UCCJA cases remain discretionary . . . . [Emphasis provided; citation omitted.]
The intervening grandparents take the position that the court does not have jurisdiction to make a child custody determination in this case, and if jurisdiction exists that it should be declined. The plaintiff argues that the court does have jurisdiction to make a child custody determination and that CT Page 2464 jurisdiction should not be declined.
Defendant father concurs with the legal position and argument of the intervening grandparents regarding jurisdictional issues. Counsel for the minor children also take the position that this court does not have jurisdiction to enter a child custody determination.
III. THE ISSUE OF JURISDICTION REGARDING THE MINOR CHILD CURTISS
Curtiss was born on February 2, 1983. He resided with the plaintiff and the defendant until February 27, 1989, when his father brought him to the home of Charlotte Graham, following the arrest of the plaintiff for possession of cocaine. He resided with his aunt, Charlotte Graham, from February 27, 1989 until July of 1990, when he went to Florida to reside with the intervening parties. He has resided with them in Florida since July of 1990. The Brookfield Probate Court awarded temporary custody of C.J. to Charlotte Graham on March 7, 1989. On January 23, 1990, the Brookfield Probate Court removed the plaintiff and the defendant as guardians of the person of both Curtiss and Clifton, and appointed the paternal aunt, Charlotte E. Graham, as guardian. By decree, dated June 25, 1991, guardianship of Curtiss was transferred to Marjorie Bryant by the Brookfield Probate Court. She continues to be his guardian at the present time.
It is clear that this court does not have jurisdiction to make a child custody determination regarding the minor child Curtiss, under the provisions of § 46-B93(a)(1), since this state was not his home state at the commencement of the proceeding, and was not the child's home state within six (6) months before the commencement of the proceeding. It is also clear that this court does not have jurisdiction to make a child custody determination regarding Curtiss under the provisions of § 46b-93 (a)(3), since the child is not physically present in this state, and further, the child has not been abandoned. Further, this court does not have jurisdiction to make a child custody determination regarding Curtiss under the provisions of § 46b-93 (a)(4), since Florida would have jurisdiction under prerequisites substantially in accordance with subdivisions (2) and (3) of § 46b-93 (a) under the provisions of Florida statute 61.1308(1)(b). The issue then is whether this court has jurisdiction to enter a child custody determination regarding the minor child Curtiss, under the provisions of § 46b-93 (a)(2), which requires that it be in the best interests of the child that CT Page 2465 a court of this state assume jurisdiction because the child and his parents, or the child and at least one contestant, have a significant connection with the state, and there is available in this state substantial evidence concerning the child's present or future care, protection, training and personal relationships. The court finds that the child and the plaintiff have a significant connection with this state, and that there is available in this state substantial evidence concerning the child's present or future care, protection, training and personal relationships.
The court makes the following additional findings of fact.
Curtiss is now thirteen (13) years old, having been born on February 2, 1983. For the first six (6) years of his life, until February of 1989, he resided in Connecticut with his parents. Between February of 1989 and July of 1990, he resided with his paternal aunt, Charlotte Graham, in Connecticut. He has now resided in Florida for slightly in excess of five and one-half years. He then commenced therapy with Dr. Marc Gershowitz, psychologist, of Danbury, Connecticut. Dr. Gershowitz saw both boys for counseling on three occasions during the summer of 1993. He also saw both children regularly before they moved to Florida. Dr. Gershowitz maintained contact with the children and with Dr. Violet Poetter, their Florida therapist, and has had access to Dr. Poetter's reports. He has also observed the children interacting with the plaintiff. There have been three custody studies done by Family Services of the Superior Court in Danbury, Connecticut. The first was completed on October 8, 1992. During the course of the evaluation, the parties agreed that the intervening parties would maintain sole custody of the two children. That agreement later fell apart. The matter was again referred to Family Services for a custody study that was completed on November 29, 1993. An additional custody study was completed on September 27, 1994. The last two custody studies provide to the court substantial evidence concerning the child's present or future care, protection, training and personal relationships. Maureen Whitney, a Family Relations Counselor, also observed the children interact with the plaintiff. She also interviewed the intervening grandparents and was provided with a home study performed by a parallel Florida agency, the Department of Health and Rehabilitative Services. Ms. Whitney has been provided access to the children's Florida school, medical and psychological records.
Both the plaintiff and the defendant resided in Connecticut CT Page 2466 for many years prior to their marriage on September 11, 1982. The plaintiff has resided in Connecticut since the marriage and up to the present time. The defendant resided in Connecticut since the marriage until 1989 when he moved to Florida where he resides at the present time.
In addition to the plaintiff residing in Connecticut, since prior to the marriage of the parties and up to the present time, her mother also resides in Connecticut and has maintained contact with both children throughout their lives. Substantial evidence is also available through the involvement of the Department of Children and Families in this case. There is also available in this state substantial evidence concerning his future care and protection by the. plaintiff in the event she was to obtain custody.
IV. THE ISSUE OF JURISDICTION REGARDING THE MINOR CHILD CLIFTON
Clifton was born on March 21, 1984. He lived with the plaintiff and defendant until February 27, 1989, when his father brought him to the home of Charlotte Graham, following the arrest of the plaintiff for possession of cocaine. He resided with his aunt, Charlotte Graham, from February 27, 1989 to March 1989. He was then sent to his paternal grandparents in Florida by Charlotte Graham, where he resided from March, 1989 to July, 1989. The court finds that his removal to Florida from March, 1989 to July, 1989, constituted a period of temporary absence.Perez v. Perez, 212 Conn. 63, 70 (1989). In July, 1989, he was returned to Connecticut to the home of Charlotte Graham. On June 21, 1991, he went to Florida and has resided with the intervening grandparents since that date and up to the present time.
It is clear that this court does not have jurisdiction to make a child custody determination regarding Clifton under the provisions of § 46b-93 (a)(3), since the child is not physically present in this state, and further, the child has not been abandoned. Further, this court does not have jurisdiction to make a child custody determination regarding Clifton under the provisions of § 46b-93 (a)(4), since Florida would have jurisdiction under prerequisites substantially in accordance with subdivisions (2) and (3) of § 46b-93 (a) under the provisions of Florida statute 61.1308(1)(b). The issue then is whether this court has jurisdiction to enter a child custody determination, regarding the minor child Clifton, under the provisions of § 46b-93 (a)(1) and/or § 46b-93 (a)(2). Section 46b-93 CT Page 2467 (a)(1)(B) provides that this court shall have jurisdiction to make a child custody determination by initial decree if this state had been the child's home state, within six months before the commencement of the proceeding, and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state. This court finds that Connecticut was the child's home state within six months before the commencement of the proceeding. This court further finds that the child was removed from Connecticut, and has been retained by the intervening grandparents who are claiming his custody. This court further finds that a parent, namely, the plaintiff, continues to live in this state. This court, therefore, finds that it has jurisdiction to make a child custody determination by initial decree regarding the minor child Clifton, under the provisions of § 46b-93 (a)(1)(B). The remaining issue is whether this court has jurisdiction to enter a child custody determination, regarding the minor child Clifton, under the provisions of § 46b-93 (a)(2), which requires that it be in the best interests of the child that a court of this state assume jurisdiction because the child and his parents, or the child and at least one contestant have a significant connection with the state, and there is available in this state substantial evidence concerning the child's present or future care, protection, training and personal relationships. This court finds that the child and the plaintiff have a significant connection with this state and that there is available in this state substantial evidence concerning the child's present or future care, protection, training and personal relationships. The court makes the following additional findings of fact. Clifton is now almost twelve (12) years old, having been born on March 21, 1984. For the first approximate five (5) years of his life, between March, 1984 and February, 1989, he resided in Connecticut with his parents. He stayed with the intervening grandparents in Florida from March through July, 1989, when he was returned to the home of Charlotte Graham in Connecticut. He remained in her home from July, 1989 until June 21, 1991. On June 21, 1991, he went to live with the intervenors in Florida, and has continued to reside with them up to the present time. He has now resided for slightly less than five years in Florida. He commenced therapy with Dr. Marc Gershowitz, psychologist, of Danbury, Connecticut. Dr. Gershowitz saw both boys for counseling on three occasions during the summer of 1993. He also saw both children regularly before they moved to Florida. Dr. Gershowitz maintained contact with the children and with Dr. Violet Poetter, their CT Page 2468 Florida therapist, and has had access to Dr. Poetter's reports. He has also observed the children interacting with the plaintiff. There have been three custody studies done by Family Services of the Superior Court in Danbury, Connecticut. The first was completed on October 8, 1992. During the course of the evaluation, the parties agreed that the intervening grandparents could maintain sole custody of the two children. That agreement later fell apart. The matter was again referred to Family Services for a custody study that was completed on October 29, 1993. An additional custody study was completed on September 27, 1994. The last two custody studies provide to the court substantial evidence concerning the child's present or future care, protection, training and personal relationships. Maureen Whitney, a Family Relations Counselor, also observed the children interact with the plaintiff. She also interviewed the intervening grandparents and was provided with a home study performed by a parallel Florida agency, the Department of Health and Rehabilitative Services. Ms. Whitney has been provided access to the children's Florida school, medical and psychological records. Both the plaintiff and the defendant resided in Connecticut for many years prior to their marriage on September 11, 1982. The plaintiff has resided in Connecticut since the marriage and up to the present time. The defendant resided in Connecticut since the marriage, until July, 1989, when he moved to Florida where he resides at the present time. In addition to the plaintiff residing in Connecticut, since prior to the marriage of the parties and up to the present time, her mother also resides in Connecticut and has maintained contact with both children throughout their lives. Substantial evidence is also available through the involvement of the Department of Children and Families in this case. There is also available in this state substantial evidence concerning his future care and protection by the plaintiff in the event she was to obtain custody.
In conclusion, this court finds that both Florida and Connecticut would have concurrent jurisdiction to make a child custody determination regarding each child. This court further finds that it is in the best interest of each child that this court assume jurisdiction under the provision of § 46b-93(a)(2)(A)(B) to make a child custody determination regarding each child because each child and the plaintiff have a significant connection with this state, and there is available in this state substantial evidence regarding each child's present or future care, protection, training and personal relationships. This court further finds that this state has been Clifton's home CT Page 2469 state within six months before the commencement of this dissolution proceeding, and the child is absent from this state because of his retention by the intervening grandparents who are claiming his custody, and that the plaintiff mother continues to live in this state. Therefore, this court has jurisdiction under the provision of § 46b-93 (a)(1)(B) to make a child custody determination regarding the minor child Clifton.
V. INCONVENIENT FORUM
This court finds that it is not an inconvenient forum to make a child custody determination under the circumstances of this case regarding both children. This court also finds that the Florida court would be an appropriate forum to also make a child custody determination regarding each child. In reaching this conclusion, this court has considered the factors expressed in § 46b-97 (c), and has considered the overall goal in determining if it is in the interest of the children that another state assume jurisdiction. This court finds that it is in the best interest of the children that this court assume jurisdiction of the issue of custody and visitation.
VI. THE ISSUE OF CUSTODY AND VISITATION
A number of statutes are relevant to the dispute regarding custody and visitation. Section 46b-56 (a) provides that in any controversy before the Superior Court as to custody or care of minor children, the court may at any time make or modify any proper order regarding custody and visitation if it has jurisdiction under the provisions of Chapter 815o. Subject to the provisions of § 46b-56a, the court may assign the custody of any child to the parties jointly, to either party or to a third party, according to its best judgment, and upon the facts of the case, and subject to such conditions and limitations as it deems equitable. Section 46b-56(b) provides that in making or modifying any order with respect to the custody or visitation, the court shall: (1) be guided by the best interests of the child, giving consideration to the wishes of the child, if the child is of sufficient age and capable of forming intelligent preferences; and (2) consider whether the parties satisfactorily completed participation in a parent education program established pursuant to § 46b-69b. None of the parties to this action have completed the parent education program. Section 46b-56b provides that in any dispute as to the custody of a minor child involving a parent and non-parent, there shall be a presumption that it is CT Page 2470 in the best interests of the child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to have custody.
One of the disputes between the parties is as to what factors are relevant to rebut the presumption that it would be in the best interests of each child to be in the custody of the parent by showing that it would be detrimental to each child to permit the parent to have custody. The Appellate and Supreme Court cases that have dealt with the phrase "detrimental to the child," have arisen out of termination of parental rights actions. There are no Appellate or Supreme Court cases that have addressed the factors to consider under § 46b-56b, in determining whether it would be detrimental to the child to permit the parent to have custody. One of the grounds to terminate parental rights is where there is no ongoing parent-child relationship, and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interests of the child. In the case of In re Juvenile Appeal,177 Conn. 648 (1979), the minor child had been adjudicated as "uncared for" and was committed to the defendant, Commissioner of Children and Youth Services. Subsequently, the mother filed a petition to revoke the commitment. The court found that the grounds for the commitment had no longer existed. The issue was whether the mother had a right to have the child returned to her when the cause for the commitment no longer exists. The court first held that parents have no natural right to their children that can prevail over a disposition effecting the child's best interests. Parents are entitled to a presumption, absent a continuing cause of commitment, that revocation would be in the child's best interest unless the state could prove otherwise. The court went on to reject the so-called "parental rights" theory under which the parent has rights superior to all others except when the parent is proved unfit. The court further held that the crucial issue in determining whether the state had met its burden of proof is whether it has shown that a shift in custody back to the mother will be detrimental to the child. The factors that are to be considered in making this assessment include: (1) the length of stay with a non-parent; (2) the nature of the child's relationship with the non-parent; (3) the degree of contact maintained with the natural parent(s); (4) the nature of the relationship between the child and the natural parent(s). This court finds that the same factors that are relevant in a dispute between the parent and the state in Juvenile Court, in CT Page 2471 determining whether a shift in custody back to the mother will be detrimental to the child, are the same factors to consider where the custody dispute is between the parent and the non-parent in a dissolution proceeding.
These factors will be considered seriatim regarding each child. The court finds the following additional facts.
A. THE ISSUE OF DETRIMENT REGARDING CLIFTON
1. THE LENGTH OF CLIFTON'S STAY WITH THE INTERVENING GRANDPARENTS.
Clifton was born on March 21, 1984. He remained in the care and custody of his parents until February 27, 1989. He resided with his aunt, Charlotte Graham, from February 27, 1989 until March, 1989. Between March and July of 1989, he resided with the intervening grandparents in Florida. He then resided with his aunt, Charlotte Graham, in Connecticut between July of 1989 and June 21, 1991. He has resided with the intervening grandparents in Florida since June 21, 1991.
2. THE NATURE OF HIS RELATIONSHIP WITH THE INTERVENING GRANDPARENTS.
Marjorie Bryant is sixty-six (66) years old and will turn sixty-seven (67) in February of 1996. She does not have any health problems. Her husband is seventy (70) years old. He is in excellent health and very active playing golf five to six days a week. She and her husband are both retired. Both intervening grandparents have a very warm relationship with the minor child. They both show the child love and the child is aware that he is loved by them. Clifton is emotionally attached to the intervening grandparents. The personality of the intervening grandparents is much more conducive to the psychological development of the child than that of the plaintiff's. The grandparents are able to provide for his emotional needs. Clifton looks upon his grandmother as being his natural mother.
3. THE DEGREE OF CONTACT MAINTAINED WITH THE PLAINTIFF.
During the period of March, 1989 through July of 1989, when Clifton was residing with the intervening grandparents, the plaintiff did not attempt to see him at all. He was then returned to Connecticut where he resided with his paternal aunt, Charlotte CT Page 2472 Graham, from July of 1989 through June 21, 1991. During this period of time, the plaintiff visited with Clifton at the residence of the paternal aunt every third Sunday. There was a visitation order entered by the Brookfield Probate Court on September 26, 1989 that provided as follows:
 The respondents, Cynthia Bryant and Curtiss Owen Bryant, are hereby granted visitation with the minor children, which visitation shall be SUPERVISED by Charlotte Graham, or Brian Graham, or some suitable person chosen by them. The visitation shall be on the premises of the Graham household or at such other site as shall be mutually acceptable to both parties and shall occur every third Sunday, starting on October 8, 1989, from 2:00 p.m. to 4:00 p.m.
 It is further ordered that continuation of said visitation, and any modifications thereto shall be contingent upon the following:
 1. Respondents seeking appropriate counseling and working with said counselor or counselors to establish a treatment plan with specific goals.
 2. Respondents showing the Court a good faith effort to accomplish these goals and a substantial accomplishment of same.
 3. Respondents active and sincere participation in a twelve-step program of their own choice.
 4. Respondents' continuous and uninterrupted total abstinence from the use of alcohol and drugs.
 **This visitation order shall be reviewed within six months and shall be modified or continued, specifically taking into account the above factors and ABOVE ALL, THE BEST INTERESTS OF THE MINOR CHILDREN. This Court would like to point out, however, that the future of visitation rests largely within the hands of the respondents themselves, since their demonstration of effort and accomplishment regarding the above stated conditions shall be a major factor in future visitation decisions.
The plaintiff never attempted to get increased visitation through the Brookfield Probate Court. The plaintiff never attempted to complete the twelve step program referred to in paragraph three of the order. The first time the plaintiff saw the child in CT Page 2473 Florida was between August 17 and August 25, 1991. During this period of time, she stayed with the defendant in Florida. There was a probate order entered on July 30, 1991 regarding visitation that provided as follows:
 After hearing and due consideration, this Court orders that the petitioner, Cynthia Bryant, be allowed reasonable visitation with the minor child, Clifton Alan Bryant, during the period of her visitation in Florida, which period is anticipated to be between August 16, 1991 and August 26, 1991; said visitation shall be at the reasonable discretion of the grandmother, Marjorie Bryant, and it is specifically provided that said visitation shall occur ON THE GRANDMOTHER'S PREMISES ONLY, and shall be SUPERVISED AT ALL TIMES.
The plaintiff and defendant saw both boys part of most days that she was in Florida. Both boys did not want their picture taken with her during the time she was in Florida. There were occasions when she would be at the intervening grandparents' home sleeping, with the grandmother watching the children. There was one occasion when the plaintiff and the defendant took both children alone to Universal Studios for one day. This August 1991 visit was the only time that the plaintiff saw the children in 1991.
In June of 1992, the intervening grandparents brought both boys to Connecticut. The plaintiff visited with the boys for several days while they were at the home of the plaintiff's mother, Mrs. Ferris, with the visitation being supervised by Mrs. Ferris per Probate Court order. The intervening grandmother was here on that occasion for a family relations study. The boys were here from between seven to ten days. The intervening grandmother would bring the boys to the home of Mrs. Ferris where the visitation took place, and she would then pick them up at the home of Mrs. Ferris following the visitation. During the Christmas period of 1992, the plaintiff flew to Texas where the Bryants were visiting with the boys. She returned to Connecticut with the boys for a one week visit. The Christmas, 1992 visit lasted approximately one week. During the Christmas, 1992 visit, the plaintiff was residing with her mother. The children stayed at her mother's residence. The plaintiff returned the children to Texas following the one week visit. These two visits were the only occasions that the plaintiff attempted to see the boys in 1992. In 1993, the plaintiff was to initially have visitation during the school spring break of 1993. The children'spsychologist recommended that there be no visit during thisperiod of time due to severe regression that was shown by CurtissCT Page 2474following the Christmas 1992 visit. The plaintiff agreed to eliminate the spring visit and to extend the summer 1993 visit to six weeks in Connecticut. During the summer of 1993, the children were in Connecticut, and stayed at the home of the plaintiff's mother for six weeks. The plaintiff took a one week vacation to care for the children. Her sister cared for the children for three weeks while the plaintiff was working. The children were in day camp for two weeks. During the three weeks that the plaintiff's sister cared for the children, the plaintiff would be with the children from 3:40 p.m. until bedtime each evening. The intervening grandparents drove the children to Virginia for the summer 1993 visit, where they were met by the plaintiff and returned to Connecticut by the plaintiff. The intervening grandparents were not in Connecticut during this visit. During the summer 1993 visit, the children were allowed to stay up until 11 p.m. During this six week period, the plaintiff took the children to a mall, camping and an amusement park and for other activities.
The plaintiff saw both children in June of 1994, for approximately ten days. The children stayed at the plaintiff's mother's home. The plaintiff was living in her own apartment in Danbury at that time. She took a one week vacation to spend time with the children during the visit in June of 1994. In August of 1994, the children were here and were enrolled in day camp for two weeks. They stayed overnight at the home of the plaintiff's mother. The plaintiff saw the children after work for six to seven hours each week day and for more time on the weekends.
In 1995, the plaintiff saw the children for five days in June. The children stayed in Connecticut at the home of the defendant's sister, Linda Cornell. The plaintiff saw the children for two to three hours each day. She also saw the children in Florida, when she visited them with her boyfriend for six days and five nights in August, 1995. The intervening grandparents agreed to the plaintiff seeing the children when the plaintiff was in Florida with her boyfriend in August of 1995. They paid for the plaintiff's motel for one night in Orlando, Florida. The plaintiff was in Florida as part of a time-share trip that she won. The plaintiff arrived in the Orlando area on a Monday afternoon, and the children arrived the following day with the intervening grandparents. The plaintiff and her boyfriend attended a time share meeting on Tuesday morning, and met the children on Tuesday at approximately noon. The plaintiff returned the children to the intervening grandparents after feeding them CT Page 2475 dinner at McDonald's. She and her boyfriend then went out to dinner alone. On the following day, Wednesday, the plaintiff visited with the children from breakfast until approximately 4 p.m. She then left for Daytona. The intervening grandparents brought the children to Daytona on Friday for the plaintiff to see them. The plaintiff spent approximately two and one-half hours with the children on Friday. She also spent two to three hours with them on Saturday, although she could have spent more time than that with them.
The plaintiff also telephones the boys on Sundays and talks to each of them approximately five minutes. These calls are not made on a regular basis.
4. THE NATURE OF HIS RELATIONSHIP WITH THE PLAINTIFF.
Clifton is not emotionally attached to his mother. He has not had any rebonding with her in any significant way. He suffers from regression when he is with her. He does not think of her as his mother. He is in need of a structured environment which can better be provided by the intervening grandparents. His relationship with his mother is more typical of an aunt-nephew relationship than of a parent-child relationship. The child has fear, confusion and frustration in reacting to the plaintiff. The cause of his fear is his concern that he might have to live with the plaintiff. The plaintiff cannot provide for the child's emotional needs. The child does not think of the plaintiff as his mother. He does not have any love or affection for the plaintiff at the present time.
B. THE ISSUE OF DETRIMENT REGARDING CURTISS
1. THE LENGTH OF CURTISS' STAY WITH THE INTERVENING GRANDPARENTS.
Curtiss was born on February 2, 1983. He remained in the care and custody of his parents until February 27, 1989. Between February 27, 1989 and July, 1990, he resided with Charlotte Graham in Connecticut. He then went to Florida in July of 1990, and has resided with the intervening grandparents since that date.
2. THE NATURE OF HIS RELATIONSHIP WITH THE INTERVENING GRANDPARENTS. CT Page 2476
Marjorie Bryant is sixty-six (66) years old and will turn sixty-seven (67) in February of 1996. She does not have any health problems. Her husband is seventy (70) years old, he is in excellent health and very active playing golf five to six days a week. She and her husband are both retired. Both intervening grandparents have a very warm relationship with the minor child. They both show the child love and the child is aware that he is loved by them. Curtiss is emotionally attached to the intervening grandparents. The personality of the intervening grandparents is much more conducive to the psychological development of the child than that of the plaintiff's. The grandparents are able to provide for his emotional needs. Curtiss looks upon his grandmother as being his natural mother.
3. THE DEGREE OF CONTACT MAINTAINED WITH THE PLAINTIFF.
During the period of February 27, 1989 to July of 1990, when Curtiss resided with Charlotte Graham, the plaintiff would visit with him at the residence of Charlotte Graham, supervised by Charlotte Graham, every third Sunday. There was a visitation order entered by the Brookfield Probate Court on September 26, 1989 that provided as follows:
 The respondents, Cynthia Bryant and Curtiss Owen Bryant, are hereby granted visitation with the minor children, which visitation shall be SUPERVISED by Charlotte Graham, or Brian Graham, or some suitable person chosen by them. The visitation shall be on the premises of the Graham household or at such other site as shall be mutually acceptable to both parties and shall occur every third Sunday, starting on October 8, 1989, from 2:00 p.m. to 4:00 p.m.
 It is further ordered that continuation of said visitation, and any modifications thereto shall be contingent upon the following:
 1. Respondents seeking appropriate counseling and working with said counselor or counselors to establish a treatment plan with specific goals.
 2. Respondents showing the Court a good faith effort to accomplish these goals and a substantial accomplishment of same.
 3. Respondents active and sincere participation in a twelve-step program of their own choice. CT Page 2477
 4. Respondents continuous and uninterrupted total abstinence from the use of alcohol and drugs.
 This visitation order shall be reviewed within six months and shall be modified or continued, specifically taking into account the above factors and ABOVE ALL, THE BEST INTERESTS OF THE MINOR CHILDREN. This Court would like to point out, however, that the future of visitation rests largely within the hands of the respondents themselves, since their demonstration of effort and accomplishment regarding the above stated conditions shall be a major factor in future visitation decisions.
The plaintiff never attempted to get increased visitation through the Brookfield Probate Court. The plaintiff never attempted to complete the twelve-step program referred to in paragraph three of the order. The first time the plaintiff attempted to see the child in Florida was between August 17 and August 25, 1991. During this period of time, she stayed with the defendant in Florida. There was a probate order entered on July 30, 1991 regarding visitation that provided as follows:
 After hearing and due consideration, this Court orders that the petitioner, Cynthia Bryant, be allowed reasonable visitation with the minor child, Clifton Alan Bryant, during the period of her visitation in Florida, which period is anticipated to be between August 16, 1991 and August 26, 1991; said visitation shall be at the reasonable discretion of the grandmother, Marjorie Bryant, and it is specifically provided that said visitation shall occur ON THE GRANDMOTHER'S PREMISES ONLY, and shall be SUPERVISED AT ALL TIMES.
The plaintiff saw both boys part of most days that she was in Florida. Both boys did not want their picture taken with her during the time she was in Florida. There were occasions when she would be at the intervening grandparents home sleeping with the grandmother watching the children. There was one occasion when the plaintiff and the defendant took both children alone to Universal Studios for one day. This 1, August 1991 visit was the only time that the plaintiff saw the children in 1991.
In June of 1992, the Bryants brought both boys to Connecticut. The plaintiff visited with the boys for several days while they were at the Ferris residence, with the visitation being supervised by Mrs. Ferris per Probate Court order. Mrs. Bryant was here on that occasion for a Family Services study. The boys were here from between seven to ten days. Mrs. Bryant would CT Page 2478 bring the boys to the home of Mrs. Ferris, where the visitation took place, and she would then pick them up at the home of Mrs. Ferris, following the visitation. During the Christmas period of 1992, the plaintiff flew to Texas where the Bryants were visiting with the boys. She returned to Connecticut with the boys for a one week visit. During the Christmas, 1992 visit, the plaintiff was residing with her mother. The children stayed at her mother's residence. The plaintiff returned the children to Texas following the one week visit. The June, 1992 and Christmas, 1992 visits were the only occasions that the plaintiff attempted to see the boys in 1992. The Christmas, 1992 visit lasted approximately one week. The minor child Curtiss had regression after that visit, with behavioral problems in school. He never previously had regression problems in school. The intervening grandmother was in school three to four times a week to discuss those problems. He was disrupting the classroom and disobeying his teacher. He calmed down after approximately six weeks. The child did not know why he was misbehaving. In 1993, the plaintiff was to initially have visitation during the school spring break of 1993. Thechildren's psychologist recommended that there be no visit duringthis period of time due to severe regression that was shown byCurtiss following the Christmas 1992 visit. The plaintiff agreed to eliminate the spring visit and to extend the summer 1993 visit to six weeks in Connecticut. During the summer of 1993, the children were in Connecticut and stayed at the home of the plaintiff's mother for six weeks. The plaintiff took a one week vacation to care for the children. Her sister cared for the children for three weeks while the plaintiff was working. The children were in day camp for two weeks. During the three weeks that the plaintiff's sister cared for the children, the plaintiff would be with the children from 3:40 p.m. until bedtime each evening. The intervening grandparents drove the children to Virginia for the summer 1993 visit, where they were met by the plaintiff and returned to Connecticut by the plaintiff. The intervening grandparents were not in Connecticut during this visit. During the summer 1993 visit, the children were allowed to stay up until 11 p.m. During this six week period, the plaintiff took the children to a mall, camping and an amusement park, and for other activities.
The plaintiff saw both children in June of 1994, for approximately ten days. The children stayed at the plaintiff's mother's home. The plaintiff was living in her own apartment in Danbury at that time. She took a one week vacation to spend time with the children during the visit in June of 1994. In August of CT Page 2479 1994, the children were here and were enrolled in day camp for two weeks. They stayed overnight at the home of the plaintiff's mother. The plaintiff saw the children after work for six to seven hours each week day, and for more time on the weekends.
In 1995, the plaintiff saw the children for five days in June. The children stayed in Connecticut at the home of the defendant's sister, Linda Cornell. The plaintiff saw the children for two to three hours each day. She also saw the children in Florida, when she visited them with her boyfriend for six days and five nights in August, 1995. The intervening grandparents agreed to the plaintiff seeing the children when the plaintiff was in Florida with her boyfriend in August of 1995. They paid for the plaintiff's motel for one night in Orlando, Florida. The plaintiff was in Florida as part of a time share trip that she won. The plaintiff arrived in the Orlando area on a Monday afternoon, and the children arrived the following day with the intervening grandparents. The plaintiff and her boyfriend attended a time share meeting on Tuesday morning, and met the children on Tuesday at approximately noon. The plaintiff returned the children to the intervening grandparents after feeding them dinner at McDonald's. She and her boyfriend then went out to dinner alone. On the following day, Wednesday, the plaintiff visited with the children from breakfast until approximately 4:00 p.m. She then left for Daytona. The intervening grandparents brought the children to Daytona on Friday for the plaintiff to see them. The plaintiff spent approximately two and one-half hours with the children on Friday. She also spent two to three hours with them on Saturday, although she could have spent more time than that with them.
The plaintiff also telephones the boys on Sundays and talks to each of them for approximately five minutes. These calls are not made on a regular basis.
4. THE NATURE OF HIS RELATIONSHIP WITH THE PLAINTIFF.
Curtiss is not emotionally attached to his mother. He has not had any rebonding with her in any significant way. He suffers from regression when he is with her. He does not think of her as his mother and does not have any emotional connection to her. He is in need of a structured environment which can better be provided by the intervening grandparents. His relationship with his mother is more typical of an aunt-nephew relationship than of a parent-child relationship. The child has fear, confusion and CT Page 2480 frustration in reacting to the plaintiff. The cause of his fear is his concern that he might have to live with the plaintiff. The plaintiff cannot provide for the child's emotional needs. The child does not think of the plaintiff as his mother. He does not have an emotional connection to the plaintiff. He does not have any love or affection for the plaintiff at the present time.
This court finds that it would be detrimental to both children to allow either the plaintiff or the defendant to have custody of either child. This court further finds that the presumption that it is in the best interest of the child to be in the custody of the parent, has been rebutted in this case as to each child.
The issue then is to whom custody should be granted based on the best interest of each child.
The court finds the following additional facts.
Clifton is very sensitive. He does not express himself fully. He internalizes and tries to control himself. There has been some improvement since residing with the intervening grandparents in the emotional condition of Clifton and Curtiss. Clifton is learning to be safe and to bring his feelings up to the surface. The plaintiff does not understand the nature of his problems and is unwilling to follow suggestions as to what is in Clifton's best interests. The present diagnosis of Clifton is that of avoidance personality disorder. He will need further psychological treatment. The child will be in a much more structured environment with the grandparents, which he needs. The intervening grandparents are more likely to continue to provide the psychological treatment he needs. Clifton continues to have problems with bed wetting, encopresis and temper tantrums. Curtiss still has problems with temper tantrums, anger and defiance. He needs to be able to show empathy for other people. He is now wrapped up in his own needs. The present diagnosis of Curtiss is that of Oppositional Disorder. He has personality difficulties and developmental problems. The plaintiff does not appreciate the needs of each of the children for ongoing therapy and does not accept the nature of the serious emotional problem that each boy has. Each child continues to need ongoing therapy. In determining what is in the best interest of each child, this court has been guided in part by Yontef v. Yontef, 185 Conn. 275,282-283 (1981) where the court stated, in part, as follows: CT Page 2481
 Inquiries into psychological parenting and into life style are relevant insofar as they shed light upon the effect that a parent's behavior is having on a child's well-being. Although we have recognized the useful role that psychological evaluation can play in the determination of the best interests of a child, we have also noted that either or both parents can be, or can become, psychological parents of a child. . . . see generally Goldstein, Freud Solnit, Beyond the Best Interests of the Child (1979). The test is not which parent was the better custodian in the past but which is the better custodian now. . . . Just as we have refused to adopt a conclusive presumption that a mother is always entitled to custody in preference to a father . . . so also have we rejected any presumption that a parent's life style necessarily has an adverse effect on a child. . . . In the exercise of its awesome responsibility to find the most salutary custodial arrangement for the children of divorce, the court must however take account of the parents' past behavior, since it must evaluate their present and future parenting ability and the consistency of their parenting for the purpose of determining which parent will better foster the children's growth, development and well-being. [Citations omitted; emphasis added.]
This court finds that the intervening grandparents have become the psychological parents of each child. The intervening grandparents have enrolled each child in a private school at their own expense. The children are involved in soccer, swimming and baseball, as well as church activities. The intervenors are involved in the children's activities. The intervenors have seen to it that the children's physical, mental, spiritual and emotional needs have been met. They maintain a regular schedule of therapy treatment with the children's therapist, Dr. Poetter, and have complied with her recommendations. The children's visits to Dr. Poetter have been increased at the recommendation of Dr. Poetter from once every three weeks to once every week due to their concerns as to where they will reside following the completion of this trial. The plaintiff does not recognize the serious emotional difficulties that the children have. She is not committed to a long term treatment plan of therapy for the children. Her relationship with the boys is not a "parent-child" relationship. The children do not have any emotional connection to the plaintiff. The children desire to remain in Florida with the intervening grandparents. The children require a stable, structured and predictable environment over an extended period of time, which the intervening grandparents are more likely to meet than the plaintiff or the defendant. The children have fear, confusion and frustration in reacting to the plaintiff. The cause CT Page 2482 of their fear is due to being afraid they might have to live with the plaintiff. The cause of their confusion is their anticipation of bad visits with the plaintiff. The cause of their frustration is their belief that adults are not listening to their needs for a simple, stable and supportive environment, which the intervening grandparents can best provide for them. The plaintiff is unable to properly care or manage for the children based on their tremendous needs. The personality of the intervening grandparents is much more conducive than that of the plaintiff to the psychological development of the children. Although the plaintiff has been employed on a full time basis since the period of time that the children have resided with the intervening grandparents, she has seen fit only to contribute a total of $950 towards the children's support since February, 1989, although the intervening grandparents have often requested a contribution from her. At the present time, they only seek to have the plaintiff maintain health insurance for the benefit of the minor children without paying any support. The court finds from all of the evidence presented that it is in the best interest of the children that they reside with the intervening grandparents.
The parties are in dispute as to whether, in determining the amount of support called for under the child support guidelines, the income of the intervening grandparents should be considered. The parties are in agreement that the net income of the plaintiff is $315.73 a week; the net income of the defendant is $177.35 a week; and the combined net income of the intervening grandparents is $1454 per week. In the event the intervening grandparents' income is not to be considered, then the amount of the support to be paid under the guidelines by the plaintiff would be $110, and by the defendant, $25 per week. In the event the income of the intervening grandparents was to be considered, then the amount of support to be paid by the plaintiff would be $60.84, and the amount of support to be paid by the defendant would be $25 per week. The intervening grandparents take the position that child support should be based solely on the income of the plaintiff and the defendant without regard to the intervenors' income. The intervening grandparents cite Favrow v. Vargas, 231 Conn. 1, 18,647 A.2d 731, 740 (1990) in arguing that the income of nonparent custodians are irrelevant, and it is improper to consider such income in arriving at child support determinations. The court is not persuaded by that argument for three reasons: (1) the status of the custodial parties in Favrow was only that of guardians appointed by the Probate Court; and (2) the intervening grandparents in this case are only the guardians of Curtiss and CT Page 2483 not of Clifton; and (3) the intervening grandparents in this case have been granted custody of each minor child as incident to a dissolution proceeding under the provisions of § 46b-1 (4). Section 46b-57 provides that in any controversy before the Superior Court as to custody of minor children, and on any complaint under Chapter 815j or § 46b-1, the court may allow any interested third party to intervene and may grant full or partial custody, care, education and visitation rights of such child to any such third party upon such conditions and limitations as it deems equitable. In this case, the court deems it equitable to impose conditions and limitations in granting custody, including the intervening grandparents' income, in determining the child support guidelines.
The court finds that the application of the guidelines in this case to the plaintiff would be inequitable or inappropriate, based on significant visitation expenses that she will incur in visiting with the children. The court finds that there is no reason to deviate from the guidelines insofar as the defendant is concerned. This court has also considered the provisions of §46b-81 in determining the issues of property, and has considered the provisions of § 46b-82 in deciding the issues of alimony. The court enters the following orders.
ORDERS
1. Custody of the two children is awarded to the intervening grandparents.
2. The plaintiff shall have reasonable, liberal and flexible visitation with the minor children in Florida, including but not limited to the following:
a. Two one-week visits during each calendar year to be exercised during school vacations of the minor children and upon mutual agreement between the plaintiff and the intervenors. Said agreement shall not be unreasonably withheld by the intervenors. The plaintiff shall give the intervenors at least thirty (30) days notice of her intention to exercise said visitation, which shall also take into account the extracurricular activities and prior commitments of the minor children. These visits shall take place at the home of the intervenors unless otherwise agreed to by the parties.
b. Two weeks during each summer school vacation of the minor CT Page 2484 children, and upon mutual agreement between the plaintiff and the intervenors. Said agreement shall not be unreasonably withheld by the intervenors. The plaintiff shall give the intervenors at least thirty (30) days notice of her intention to exercise said visitation. The intervenors shall do their best to ensure that summer plans for the minor children do not impair the ability of the plaintiff to exercise her right of visitation during this time. These visits shall take place at the home of the intervenors unless otherwise agreed to by the parties.
c. Weekend or other visitation upon mutual agreement between the plaintiff and the intervenors. Said agreement shall not be unreasonably withheld by the intervenors. The plaintiff shall endeavor to give the intervenors reasonable notice of her intention to exercise said visitation which shall take into account the extracurricular activities and prior commitments of the minor children. These visits shall take place at the home of the intervenors unless otherwise agreed to by the parties.
3. The intervenors shall make the minor children available for visitation with the plaintiff whenever the minor children are with the intervenors in the State of Connecticut, or its reasonable vicinity. Said visitation, if overnight, shall take place at the home of the plaintiff's mother, Joan Ferris.
4. The defendant shall have reasonable, liberal and flexible visitation with the minor children in Florida, which visitation shall be supervised and at the discretion of the intervenors.
5. Both the plaintiff and the defendant shall be solely responsible and pay for all expenses incurred in the exercise of her/his rights of visitation.
6. The plaintiff shall be entitled to telephone the minor children daily, provided said contact is made at reasonable times, taking into account the extracurricular schedules and bedtimes of the minor children.
7. The plaintiff is to provide health insurance for the benefit of the minor children through her employment at her sole expense. Any unreimbursed health expenses are to be split equally between the plaintiff and the intervening grandparents. The provision of § 46b-84 (d) are applicable.
8. Counsel for the minor children, Attorney Susan J. Poll, is CT Page 2485 awarded counsel fees of $6785 plus costs of $24.84. In awarding such fees, the court has considered the provisions of §46b-62. The intervening grandparents are to pay $4000 of that amount by June 10, 1996. The plaintiff is to pay $1800 and the defendant is to pay the sum of $1,009.84, both by June 10, 1996. No counsel fees are awarded in favor of either the plaintiff or the defendant.
9. The plaintiff is to pay to the intervening grandparents as support the sum of forty ($40) dollars per week, and the defendant is to pay as support the sum of twenty-five ($25) dollars per week. An immediate wage execution is authorized against the plaintiff.
10. No alimony is awarded in favor of either the plaintiff or the defendant.
11. The marriage between the parties is dissolved, and each party is declared to be single and unmarried.
12. The liability shown on the plaintiff's financial affidavit, dated November 9, 1995, is to be paid by the plaintiff, and she is to hold the defendant harmless therefrom. All assets shown on the plaintiff's financial affidavit are awarded solely to the plaintiff.
13. All liabilities as shown on the defendant's financial affidavit, dated November 3, 1995, are to be paid by the defendant, and he is to hold the plaintiff harmless therefrom. All assets shown on his financial affidavit are awarded to the defendant.
14. Counsel for the intervening grandparents are to prepare the judgment file within thirty (30) days and send it to counsel for the plaintiff for signature, who is to then send it to counsel for the defendant for signature, who is to then send it to counsel for the minor children for signature and filing.
Axelrod, J.